UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| THOMAS R. SIMOKONIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | 06-40263-FDS |
| | ) | |
| SAINT-GOBAIN CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER
ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is a dispute arising from the denial of continued long-term disability benefits. The matter arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*. Plaintiff Thomas R. Simokonis was covered by a long-term disability plan as a benefit of his employment with defendant Saint-Gobain Corporation. Simokonis suffered from medical conditions that prevented him from working at "his own" occupation, and received disability benefits as a result. Under the plan, however, he was entitled to benefits after 24 months only if he could not work at "any reasonable" occupation. The plan administrator concluded that he was not totally disabled and terminated his benefits. After an unsuccessful appeal to the Saint-Gobain benefits committee, Simokonis filed this lawsuit.

Pending before the Court is defendant's motion for summary judgment. For the reasons stated below, the motion will be granted.

I.      **Statement of Facts**

The following facts are undisputed unless otherwise noted.

   A.      **Simokonis's Initial Disability Claim**

As of 1997, Thomas Simokonis was employed by Saint-Gobain Corporation as a "shipper." His actual job duties are unclear, but it appears that he operated a fork lift truck. At some point, apparently in 1997, Simokonis developed pancreatitis and a bowel obstruction. In late 1997 and early 1998, he suffered life-threatening complications and underwent multiple surgical procedures. He was hospitalized in November 1997 and remained continuously hospitalized through March 1998.

At all times relevant to this action, Saint-Gobain provided long-term disability benefits to eligible employees under the Saint-Gobain Corporation Long Term Disability Plan. The plan was administered by the Saint-Gobain Corporate Benefits Committee, which had the power "[t]o interpret the Plan, and to resolve ambiguities, inconsistencies, omissions, and factual issues, its interpretation and resolution to be final, conclusive, and binding on all parties affected thereby." *See* Plan § 8.4(c). In January 1998, the Committee entered into an administrative services contract with Aetna Life Insurance Company. Aetna thereafter acted as an agent of the Benefits Committee, providing claims administration services and initial claim determinations subject to the right of the Committee to review and modify any of its decisions.

On April 3, 1998, Simokonis filed a Disability Claim Notice with Aetna. This application was for long-term disability benefits retroactive to October 27, 1997, his last actual day of work. His reported disability at that time was pancreatitis and bowel obstruction.

Under the plan, Simokonis is considered totally disabled if, within the first 24 months of

disability, "[he] is not able, solely because of injury or disease, to perform the material duties of *his own* occupation . . . ." Plan at 59 (emphasis added). After the first 24 months of disability, however, Simokonis is considered totally disabled only if "[he is] not able, solely because of injury or disease, to work at *any reasonable* occupation . . . ." *Id.* (emphasis added).[1]

On May 15, 1998, Aetna completed its review of Simokonis's application and determined he met the definition of total disability—that is, he was not able to perform the material duties of "his own" occupation. Saint-Gobain began paying long-term benefits to Simokonis retroactive to October 27, 1997. Aetna advised Simokonis that the eligibility standard for long-term disability benefits would change after 24 months, or on October 28, 1999.

### B.     1997-2001 Receipt of Disability Benefits

After leaving the hospital in March 1998, Simokonis's medical problems persisted. He was diagnosed with tendinitis in both shoulders in May. He received an ileostomy reversal in June and an umbilical hernia repair in July.[2]

On October 13 and 14, 1999, at Aetna's request, physical therapist Susan Novack performed a Functional Capacity Evaluation ("FCE") upon Simokonis. According to the FCE report, any meaningful physical activity by Simokonis was followed by fatigue and forearm pain, and he also suffered from sciatica and numbness and tingling in the forearms. He could tolerate light physical activity for only two hours, even with periodic shifts from sitting to standing. The

---

[1] Under the plan, "any reasonable occupation" only includes those positions that allows a claimant to earn 80% or more of adjusted pre-disability earnings. *Id.* It must also be a "gainful activity for which [plaintiff is], or may reasonably become, fitted by education, training, or experience." *Id.*

[2] At some unspecified point, Simokonis applied for and began to receive Social Security disability benefits retroactive to April 1, 1998.

FCE report concluded that Simokonis could not return to his previous occupation.

From late 1999 through 2001, Simokonis's treating physician, Dr. Robert Maloney, periodically submitted reports to Aetna indicating that he suffered from multiple medical conditions, including pancreatitis, numbness of both arms, sciatic numbness, headaches, fatigue, and a lack of strength.[3]  Each report indicated that Dr. Maloney classified Simokonis as having a "severe limitation of functional capacity; incapable of minimal sedentary activity."  Record at 699-707.

Based on the Novack FCE and Dr. Maloney's evaluations, Simokonis continued to receive long-term disability benefits through 2001.

### C. The Aetna Investigation

For reasons that are not clear, Aetna began conducting surveillance on Simokonis in July 2001.  In December 2001, Dr. Claudia Hix, Aetna's Medical Director, created a report on Simokonis based on her review of the surveillance results and Dr. Maloney's evaluations.  Dr. Hix's report stated that Simokonis was able to push and bend over a shopping cart, lift wire tomato cages and other objects into his vehicle, reach overhead with his right arm, move his body freely, and walk normally.  Record at 710-11.  She concluded that Simokonis's surveilled activities were inconsistent with a classification of "severe limitation of functional capacity," and recommended additional surveillance and another FCE.

On January 17, 2002, a further FCE was performed on Simokonis by physical therapist Jeannine Burke.  Burke concluded, based on her tests of his physical characteristics, that he was able to work in a "medium work category" for eight hours a day.  This category can include work

---

[3] Dr. Maloney also diagnosed low back pain, coronary artery disease, episodic twitching, and myoclonus.

4

with occasional bending, stooping, overhead reaching, repetitive reaching, repetitive squatting, kneeling, and use of fine motor abilities. She recommended a job where Simokonis could change position from sitting to standing periodically and that involved only simple sequences of tasks. *See id.* at 1542-43.

On February 4, 2002, another medical examination, also at Aetna's request, was performed upon Simokonis by Dr. Mark Friedman. Based on this examination, Dr. Friedman concluded that Simokonis was capable of sedentary to light work involving (1) unlimited use of his upper extremities, (2) unrestricted head and neck movement, and (3) a twenty-pound lifting restriction. The report indicates that Dr. Friedman was aware of Simokonis's previously diagnosed conditions (pancreatitis, ventral hernia, low back pain, sciatica) when he made his conclusions.[4]

Finally, in February 2002, Aetna hired an outside party, Concentra Managed Care Services, to prepare a "Labor Market Survey Report" for Mr. Simokonis. This report identified a list of fifteen then-available jobs that Simokonis could perform given his work history, education, physical restrictions, and work capacities. *See id.* at 1631-42.

### D. Denial of Benefits and Provisional Reinstatement

Aetna advised Simokonis on May 13, 2002, that it had determined he was capable of being gainfully employed in an occupation for which he was qualified by education, training, or experience. *See* Plan at 59; Record at 1652. Simokonis's disability benefits were accordingly

---

[4] At some unspecified point in February 2002, a letter was sent to Aetna by an anonymous person who claimed to be a neighbor of Simokonis. This person contended that he regularly saw Simokonis engaged in yard work, including chopping and carrying wood, cutting grass and hedges, gardening, washing his vehicle, carrying trash, and performing other labor on his home.

terminated effective May 31, 2002. Aetna specifically identified the bases for its determination: the Burke FCE, the Friedman medical examination, and the Labor Market Survey Report. *Id*. at 1652-1655.

Simokonis first appealed the decision within Aetna. In August 2002, Dr. Oyebode Taiwo, Aetna's Consulting Disability Medical Director, performed a case review. Dr. Taiwo did not personally examine Simokonis, and based his review on (1) Dr. Friedman's examination, (2) records from a Dr. Callery (Simokonis's operating surgeon), (3) the 1999 and 2002 FCEs, and (4) the surveillance of Simokonis. Dr. Taiwo concluded that Simokonis did not meet the post-24 month "total disability" definition of the plan. He therefore upheld Aetna's prior determination and denied Simokonis's appeal on August 29, 2002.

Simokonis appealed that decision to the Saint-Gobain Benefits Committee. The Committee reinstated his benefits, retroactive to May 31, on November 26, 2002. The record and the parties' filings do not reveal the Committee's basis for the decision to reinstate benefits; its letter to Simokonis's counsel stated, "To be frank, we still have some concerns about his entitlement to benefits, but we have made the decision to reinstate his claim retroactively . . . ." *Id*. at 1107. The reinstatement was provisional, and dependent on Simokonis's continued disability as certified by regular medical examinations.

### E. Aetna's 2003 Investigation

In January 2003, at Aetna's request, Dr. Nicholas Tsiongas examined Simokonis in order to ascertain whether he was capable of performing "any reasonable" occupation. Dr. Tsiongas was aware of "reported diagnoses of rheumatoid arthritis, sciatica, umbilical hernia, borderline spinal stenosis, and pancreatitis," although Aetna provided no medical records. Simokonis

6

provided Dr. Tsiongas with a variety of medical documents, including (1) a note from Patricia Senior, R.N., indicating that Simokonis had exhibited symptoms of post-traumatic stress disorder since mid-1999, (2) a note from Dr. Maloney documenting the 1997 hospitalization for pancreatitis and the various surgeries that followed, and (3) a note from Dr. Phillip Lahey documenting treatment for chronic shoulder and low back problems. The notes of Drs. Lahey and Maloney both stated that Simokonis was totally disabled and unable to work. *Id.* at 794.

After reviewing the records and examining Simokonis, Dr. Tsiongas concluded that Simokonis could work eight hours a day with the following restrictions: (1) a ten-pound lifting limit with the left arm and no work above the level of the left shoulder, (2) an overall twenty-five pound lifting limit because of back pain, and (3) a thirty-minute one-way driving restriction because of back pain. Dr. Tsiongas based these restrictions on his physical limitations only, and did not impose restrictions based on possible post-traumatic stress disorder.

In April 2003, Simokonis was examined by Dr. Stephan Simonian, a psychiatrist, concerning a possible issue of post-traumatic stress disorder. Dr. Simonian concluded that there was "no manifestation of a major disorder of thought process or thought content" and "[his] mental and psychiatric complaint did not constitute a recognizable pattern of medical or psychiatric illness." *Id.* at 808. He noted that a diagnosis of "hysterical conversion reaction" or "malingering" could not be ruled out, but ultimately diagnosed an "adjustment disorder with mixed emotional features." His report concluded that from a psychiatric point of view, even taking into account the diagnosed adjustment disorder, Simokonis could return to work by May 21, 2003. *Id.* at 805.

Dr. Wadie Akhouri submitted a Mental Health Provider's Statement to Aetna in March

2003, indicating that Simokonis had a marked limitation with respect to maintaining attention and concentration; performing a variety of duties; directing, controlling or planning activities of others; and influencing people in their opinions and attentions. He also indicated that Simokonis was never able to perform activities at a constant pace. *Id*. at 802. Dr. Akhouri concluded that Simokonis's prognosis for returning to any type of occupation was "guarded" and that he would not benefit from vocational training.

Ms. Senior submitted a report to Aetna dated June 2, 2003, indicating that she had diagnosed Simokonis with post-traumatic stress disorder, and that he exhibited symptoms of sleep disturbance, electrical impulses, disorganized thoughts, rumination, hypervigilance, hypersensitivity, flashbacks, irritability, and startle responses. Ms. Senior did not give an opinion as to his suitability for returning to any occupation.

### F.     June 2003 Termination of Benefits and Appeals

Aetna informed Simokonis on June 23, 2003, that it was terminating his benefits effective July 1. Aetna gave the following as the basis for this decision: (1) Dr. Tsiongas's January 2003 examination, (2) the mental health information provided by Ms. Senior, (3) Dr. Simonian's April 2003 psychiatric evaluation, and (4) a review of those documents by Dr. Walter Defoy, Aetna's medical director. Dr. Defoy concluded that Simokonis's physical limitations were not "totally disabling" and that Dr. Simonian's examination did not support a diagnosis of post-traumatic stress disorder. *Id*. at 498-499.

Simokonis did not immediately formally appeal this decision. Instead, in late 2003 he submitted additional reports to Aetna from Dr. Charles Wolfson, Dr. Maloney, Dr. Robert McGann, Dr. Joseph Oyer, Dr. Callery, Dr. Lahey, and Dr. Owen Ryan. Drs. Wolfson, Maloney,

and McGann stated that Simokonis suffered from post-traumatic stress disorder and could not work. Dr. Oyer stated that Simokonis had a history of nasal problems and should avoid dust, chemicals, fumes, and extremes of temperature, but did not make a definitive statement about whether he could or could not work. Dr. Callery, a surgeon who had operated on Simokonis in late 1997, commented on the status of Simokonis's incisional hernias, but did not comment on whether he could or could not work. Dr. Lahey stated that he had never treated Simokonis, but monitored his condition only; based on his reported complaints, Dr. Lahey concluded that he could not return to work within the next year. Finally, Dr. Ryan stated that he was a twenty-year friend of Simokonis, and that he had informally observed a profound negative change in his personality and demeanor after the initial 1997 bout with pancreatitis. Although he wrote as a concerned friend and did not make any formal diagnoses, Dr. Ryan reported that Simokonis "thinks, acts, and feels in ways, which limit his functional capacity." *Id.* at 820.

On March 9 and 18, 2004, Aetna informed Simokonis that it had reviewed the additional material submitted by Drs. Wolfson, Maloney, McGan, Lahey, and Callery.[5] Aetna concluded that "the information does not provide us with specific functionality related to [plaintiff's] disability which would allow us to reinstate his benefit at this time."

Simokonis formally appealed the June 23, 2003 determination to the Aetna Appeals Unit on March 26, 2004. The Appeals Unit denied the appeal on April 9, 2004. That decision was then appealed to the Benefits Committee of Saint-Gobain. Simokonis submitted two new medical reports in support of the appeal: a May 2004 neuropsychological report by Dr. Andrea Piatt and

---

[5] Aetna did not specifically mention Dr. Ryan's or Doctor Oyer's letters, which were submitted in December 2003 with the other doctors' letters.

a July 2004 letter from Dr. Wolfson.[6]

Dr. Piatt noted Simokonis's complicated medical history and reported that she had performed neurocognitive tests that revealed slowed information processing speed, marked problem solving deficiencies, language retrieval weakness, and memory dysfunction. Simokonis's performance on tests designed to discover exaggeration and malingering was "inconsistent," leading Dr. Piatt to conclude that exaggeration was a possibility. Ultimately, she concluded that from a cognitive standpoint, "[Simokonis] should be able to manage some level of work that does not require speed, novel problem-solving, or supervisory responsibilities." *Id.* at 833. She also recommended that Simokonis enter an intensive anxiety disorder and post-traumatic stress disorder treatment program.[7]

Dr. Wolfson, a clinical psychologist, stated that he had been counseling Simokonis since December 4, 2003. He reported that he had reviewed Dr. Piatt's report, and criticized many of her conclusions, stating that he had never seen any evidence of malingering or exaggeration when examining Simokonis. He reiterated his December 2003 conclusion that Simokonis suffers from chronic post-traumatic stress disorder. He did not specifically reiterate his prior opinion concerning Simokonis's suitability for employment, but concluded by stating "[the post-traumatic stress disorder symptoms] contribute significantly to marked impairments in daily functioning." *Id*. at 839.

On November 19, 2004, the Benefits Committee denied the appeal. The letter sent to

---

[6] The Benefits Committee accepted this supplementary material as part of the record.

[7] Dr. Piatt did not base this recommendation on an independent diagnosis of anxiety disorder and post-traumatic stress disorder, but rather on the reports that she received documenting those conditions. *Id.* at 833.

Simokonis stated that this decision was based on "all available medical information," and specifically mentioned its consideration of the materials provided to Aetna by Simokonis. The committee memorandum recommending denial summarized Simokonis's medical history dating to when benefits were first granted in May 1998.[8]  Simokonis then brought an action in this Court.

## II.    Analysis

### A.    Standard of Review

Although summary judgment is ordinarily a procedural tool for screening out cases that do not present trialworthy issues, in ERISA actions, it is "simply a vehicle for deciding the issue." *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005).  This is because "the district court sits more as an appellate tribunal than as a trial court.  It does not take evidence, but rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary.  *See Leahy v. Raytheon Co.*, 315 F.3d 11, 17-18 (1st Cir. 2002).  As a result, in ERISA benefit denial cases, ". . . the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." *Bard v. Boston Shipping Assoc.*, 471 F.3d 229, 235 (1st Cir. 2006) (*quoting Orndorf*, 404 F.3d at 517).

A denial of benefits under ERISA is reviewed under a *de novo* standard, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  When the plan administrator has been granted such discretion, its decision must

---

[8] That summary included events and medical tests that occurred prior to the Committee's November 2002 reinstatement of benefits, including the 2001 surveillance and the 2001 medical examination of Dr. Friedman.

be upheld unless "arbitrary, capricious or an abuse of discretion." *Diaz v. Seafarer's Int'l Union*, 13 F.3d 454, 456 (1st Cir. 1994). This means that "the administrator's decision will be upheld if it is reasoned and supported by substantial evidence in the record." *Vlass v. Raytheon Employees Disability Trust*, 244 F.3d 27, 30 (1st Cir. 2001). The fact that contradictory evidence exists ". . . does not, in itself, make the administrator's decision arbitrary." *Id*.

Because questions of judgment are left to the administrator, its decision should be upheld even if the Court disagrees with it, so long as the administrator's interpretation of the plan is rationally related to a valid purpose and not contrary to the plan's plain language. *Thiffault v. Sun Life Assur. Co. of Canada*, 2007 WL 465182 *1, *5 (D. Mass. 2007) (relying on *Moats v. United Mine Workers of America*, 981 F.2d 685, 688 (3d Cir. 1992)).

It is undisputed that the plan at issue grants Saint-Gobain discretionary authority to determine benefit eligibility. Accordingly, the Court will uphold Saint-Gobain's decision to deny plaintiff benefits unless it was arbitrary, capricious, or an abuse of discretion.

### B.  Scope of Evidence to Be Considered

Judicial review of an administrator's decision is ordinarily limited to the record before the administrative decision-maker. *Brilmyer v. University of Chicago*, 431 F. Supp. 2d 154, 159 (D. Mass. 2006). In this case, the Court has already rejected plaintiff's motion to expand the medical record beyond what was available to Saint-Gobain at the time it made its final decision. *See generally Simokonis v. Saint-Gobain Corp.*, 2007 WL 2259104 (D. Mass. 2007).

Plaintiff also contends that the Court should *limit* its consideration of the record to only that record evidence that came into existence after November 26, 2002, the date of Saint-Gobain's provisional reinstatement of plaintiff's benefits. Plaintiff reasons that "[t]he Committee

had already determined that Simokonis was disabled until November 26, 2002, when they reinstated his benefits retroactively at that time." (Pl. Mem. at 4). That being the case, according to plaintiff, "the Plan administrator's decision denying benefits should be upheld only if reasoned and supported by substantial evidence of record *subsequent* to November 26, 2002." *Id.* at 5 (emphasis in original).

The Court declines to limit consideration of the record in such an artificial way. It is clear that before Saint-Gobain made its final decision, it *did* consider evidence pre-dating November 2002. All of the evidence that was before the Benefits Committee will therefore be considered by the Court.[9]

### C.     **Whether the Decision Was Arbitrary, Capricious, or an Abuse of Discretion**

Plaintiff contends that Saint-Gobain's decision to terminate benefits after June 30, 2003 was arbitrary, capricious, and an abuse of discretion because (1) the letters submitted by Drs. Wolfson, Maloney, McGan, Oyer, Lahey, Callery, and Ryan ("the Physician Letters") were not considered by Aetna and/or the Benefits Committee, and (2) the evidence that Saint-Gobain did rely on was insufficient to support the decision. The Court will consider each of these arguments in turn.

#### 1.     **Alleged Failure to Consider All Submitted Evidence**

It is undisputed that plaintiff's counsel first submitted the Physician Letters to Aetna on

---

[9] Plaintiff appears to contend that any reliance by the administrator on evidence before November 2002 was *per se* arbitrary, capricious, or an abuse of discretion. But merely because the Benefits Committee reinstated plaintiff's benefits in November 2002 does not necessarily mean the Committee considered all evidence favorable to Saint-Gobain to be irrelevant or erroneous, or that its decision permanently rendered that evidence irrelevant. The record does not reveal why the Committee reinstated benefits. Indeed, the close nature of the provisional reinstatement is referenced by the Committee's letter: "To be frank, we still have some concerns about his entitlement to benefits, but we have made the decision to reinstate [plaintiff's] claim retroactively." Record at 1107.

December 22, 2003. Plaintiff contends that this evidence was "not even considered" in the June 2003, April 2004, and November 2004 denials of plaintiff's appeals, and that the Physician Letters were not specifically identified in the various denial letters.

Of course, the Physician Letters could not have been considered by Aetna in June 2003, as they were not even submitted until December 2003. As to Aetna's April 2004 decision, the record reveals that on March 9 and 18, 2004, Aetna specifically informed plaintiff that information had been reviewed. Record at 522-25 ("We reviewed the additional medical information submitted by [Drs. Wolfson, Maloney, McGan, Lahey, and Callery], however, the information does not provide us with specific functionality related to [plaintiff's] disability which would allow us to reinstate his benefit at this time"). The letter to plaintiff denying his formal Aetna appeal on April 9, 2004, also stated that the record had been reviewed "in its entirety." *Id.* at 531.

Finally, when Saint-Gobain rendered its final decision in November 2004, its letter to plaintiff stated that the "[a]dditional clinical information which was provided to Aetna by your attorney was unable to support your inability to do your job duties." *Id.* at 1786. The Benefits Committee's internal memorandum (prepared in conjunction with the Committee's November 2004 decision) also summarizes the content of the Physician Letters. *Id.* at 1788. It is thus clear from the record that Aetna and Saint-Gobain considered the Physician Letters in the process of deciding plaintiff's claim and appeals.[10]

---

[10] The March 9 and 18, 2004 Aetna letters do not specifically mention the letters submitted by Drs. Oyer and Ryan. The Committee's internal November 2004 memorandum summarizes Dr. Oyer's letter, but does not refer to Dr. Ryan. Even assuming that Aetna's review, and the subsequent Saint-Gobain reviews, did not include the Ryan letter in its review of the file "in its entirety," *see* Record at 531, Saint-Gobain's ultimate decision was not arbitrary, capricious, or an abuse of discretion. The Ryan letter was based on informal social observations of the plaintiff as a friend and did not make a formal diagnosis or opine on his ability to work.

## 2. Alleged Insufficiency of Medical Examinations

Plaintiff concedes that the existence of evidence contrary to the administrator's decision does not render the decision arbitrary, capricious, or an abuse of discretion, provided that the decision is nonetheless supported by substantial evidence. *See Wright v. R.R. Donnelley Sons Co. Group Benefits Plan*, 402 F.3d 67, 74 (1st Cir. 2005). Plaintiff contends, however, that the evidence relied upon by the administrator to deny his claim was insufficient, even without reference to competing evidence. Specifically, plaintiff asserts that (1) the opinions of Drs. Tsiongas and Simonian were not reasonably sufficient to support benefit denial because neither opinion "consider[ed] the cumulative effect of multiple impairments" and "[did] not fairly and fully consider all of Simokonis's medical problems," and (2) Dr. Defoy's review of the Tsiongas and Simonian reports and other documents was faulty because Dr. Defoy was unaware of the full breadth of Simokonis's impairments. (Pl. Mem. at 5-6).

The record shows that Dr. Tsiongas was aware of plaintiff's medical history when he opined that plaintiff could work eight hours a day with physical restrictions. Although Aetna provided no medical records to Dr. Tsiongas, documentation sent to him prior to his examination of plaintiff indicated that he had been diagnosed with "rheumatoid arthritis, sciatica, umbillical [*sic*] hernia, borderline spinal stenosis, [and] pancreatitis." Record at 790. Plaintiff also provided Dr. Tsiongas with medical records from (1) Ms. Senior, indicating that plaintiff exhibited symptoms of post-traumatic stress disorder, (2) Dr. Maloney, documenting plaintiff's 1997 hospitalization and subsequent complications and noting his lumbar spinal stenosis, (3) Dr. Herbert Bonkovsky, a surgeon who operated on plaintiff in 1997, and (4) Dr. Lahey, documenting treatment of plaintiff for chronic shoulder and lower back problems. *Id*. at 793-794.

Plaintiff also personally recounted his medical history to Dr. Tsiongas. *Id*. at 794-795. There is nothing in the record to suggest that Dr. Tsiongas did not have an appropriate medical history of the plaintiff when he gave his opinion.

Dr. Simonian was specifically consulted in order to provide an expert psychiatric opinion. Plaintiff informed Dr. Simonian that he had been diagnosed with post-traumatic stress disorder. *Id*. at 807. Dr. Simonian concluded that "[plaintiff's] psychiatric evaluation and mental status evaluation does not manifest major disorder of thought process or thought content." *Id*. at 808. He diagnosed plaintiff as having an "adjustment disorder with mixed emotional features," and concluded from a psychiatric point of view *only* that plaintiff could return to work.[11] Again, the record reflects that Dr. Simonian had knowledge of plaintiff's relevant past medical history.

When Dr. Defoy subsequently reviewed plaintiff's file, he considered the reports of Drs. Tsiongas and Simonian. Those reports collectively addressed plaintiff's physical and mental ailments, and both reports concluded that plaintiff could return to work. Dr. Defoy also read Ms. Senior's notes on plaintiff's post-traumatic stress disorder symptoms. *Id*. at 499. Ultimately, Dr. Defoy concluded that "The physical limitations are well documented and not totally disabling . . . . In all of these notes there is no objective information presented to support a [post-traumatic stress disorder diagnosis]." *Id*. at 250. The record thus shows that Dr. Defoy was aware of the "full breadth" of plaintiff's medical history when he recommended that benefits terminate.

### 3. **Conclusion**

When Saint-Gobain considered plaintiff's final administrative appeal in November 2004,

---

[11] The record does not reveal if Dr. Simonian received any medical records relating to plaintiff's physical impairments. However, plaintiff did verbally describe his entire medical history. Record at 807.

the record contained the following evidence supporting a decision to terminate benefits:

(1) the results of a 2001 surveillance showing that plaintiff was capable of certain physical acts;

(2) the January 2002 examination by physical therapist Burke, who concluded that plaintiff could be employed in a "medium work category" for eight hours a day;

(3) the February 2002 examination by Dr. Friedman, who concluded that plaintiff was capable of sedentary to light work with lifting restrictions;

(4) the January 2003 examination by Dr. Tsiongas, who concluded that plaintiff was physically capable of work with some restrictions;

(5) the February 2003 examination by Dr. Simonian, who concluded that plaintiff was psychiatrically capable of work;

(6) the case file review by Dr. Defoy, who considered the preceding reports and plaintiff's physical and mental medical history and concluded that benefits should be terminated; and

(7) the May 2004 report of neuropsychologist Dr. Piatt, who concluded that although plaintiff suffered from some cognitive problems, he was capable of managing a level of work that did not require speed, novel problem-solving, or supervisory responsibilities.

To be sure, plaintiff has presented evidence that disputes this characterization of his physical and mental ability to return to work. But an administrator is permitted, indeed required, to weigh and assess conflicting evidence. *See, e.g., Vlass*, 244 F.3d at 31-32 (holding that insurer's decision to adopt the opinion of one physician about claimant's ability to function over

another's was not arbitrary and capricious). Saint-Gobain's decision to terminate plaintiff's long-term disability benefits was based upon substantial medical evidence and was reasonably consistent with the eligibility terms of the plan. Accordingly, that decision was not arbitrary, capricious, or an abuse of discretion.

### III.    Conclusion

For the foregoing reasons, the motion of defendant Saint-Gobain Corporation for summary judgment is GRANTED.

**So Ordered.**

                                                  /s/ F. Dennis Saylor
                                                  F. Dennis Saylor IV
                                                  United States District Judge

Dated: February 12, 2008